Anthony JACKSON, Plaintiff,
Appellant,

v.

Michael FAIR, et al.,
Defendants, Appellees.

No. 87–1589.

United States Court of Appeals,
First Circuit.

Heard Nov. 2, 1987.

Decided May 16, 1988.

Thomas M. Hefferon with whom Henry C. Dinger and Goodwin, Procter & Hoar, Boston, Mass., were on brief for plaintiff, appellant.

William D. Saltzman, Counsel, Dept. of Correction, with whom Freda K. Fishman, Associate Gen. Counsel, Dept. of Correction, and Nancy Ankers White, Sp. Asst. Atty. Gen., Boston, Mass., were on brief for defendants, appellees.

Before CAMPBELL, Chief Judge, BOWNES and BREYER, Circuit Judges.

LEVIN H. CAMPBELL, Chief Judge.

In this prisoner's 42 U.S.C. § 1983 action, plaintiff-appellant Anthony Jackson asked the district court to preliminarily order Massachusetts officials to rescind their transfer of Jackson from a psychiatric hospital to a correctional institution. The district court denied the request, and Jackson appeals.

I.

Appellant Anthony Jackson is serving several sentences, including three consecu-tive life sentences for first degree murder, in the custody of the Massachusetts Department of Correction. He has been in continual custody of state or county officials since December 1972 and in state custody since June 1976. In July 1981 he was committed to Bridgewater State Hospital ("Bridgewater")—a high-security psychiatric hospital administered by the Massachusetts Department of Correction. He was returned to a state penal institution briefly in January 1985 and recommitted to Bridgewater just nine days later. His most recent commitment ended on February 23, 1987, when he was moved from Bridgewater to MCI–Norfolk, a medium-security penal institution.

This appeal concerns Jackson's violent dissatisfaction with his February 1987 transfer. The transfer had its origins in July 1986 when Dr. Wesley Profit, who served as the Forensic Director of Bridgewater and had known Jackson for five years, determined that Jackson no longer needed to remain in Bridgewater. To effect Jackson's return to the general prison population, Dr. Profit decided not to petition for Jackson's recommitment to Bridgewater. Under Massachusetts law, orders of commitment are valid for a maximum of one year, and patients are then automatically returned to whence they came—prisoners return to penal institutions, and non-prisoners return to society. See Mass.Gen. Laws ch. 123, §§ 8, 18 (1987). Jackson's commitment order was due to expire in early October 1986.

On September 19, 1986, Dr. Profit informed Jackson that Jackson would not be recommitted to Bridgewater. Jackson responded in a letter to the Bridgewater staff threatening suicide if he were transferred to a penal environment. Dr. Profit was not surprised by this response—he felt it fit with Jackson's history of manipulative behavior. However, when the letter was received, Dr. Profit was out of town. In Dr. Profit's absence, the Bridgewater staff adopted a cautious course of action, and petitioned for recommitment. On his return, Dr. Profit continued with his plans to return Jackson to the general penal popula-

tion. On February 6, 1987, a classification board convened to decide the level of security Jackson would require upon his return to prison. The board reclassified Jackson from "maximum security" to "medium security," making him eligible for placement at MCI–Norfolk. On February 18, staff members of Bridgewater and MCI–Norfolk met to discuss Jackson's medical needs, and how to cope with his suicidal threats. On February 21, Dr. Profit received a comprehensive medical report from a Dr. Kobrin, who concluded that there was no reason why Jackson could not be returned to a prison setting. Finally, on February 23, 1987, Jackson was discharged from Bridgewater and transferred to MCI–Norfolk.

Jackson received no prior notice of his transfer. On the morning of February 23, 1987, he was told to report to the Property Room at Bridgewater. When he arrived, several guards were waiting for him. Jackson was then taken to MCI–Norfolk.

Upon arrival at MCI–Norfolk, Jackson at first exhibited suicidal behavior: he went on a hunger strike, he injured himself by attempting to swallow a bed spring, and he refused medication. Jackson explained that he would only begin eating if he were returned to Bridgewater. By June 9, however, an MCI–Norfolk official observed that Jackson was "calm and rational" for the past several weeks, and that Jackson was pursuing his litigation activities.

On March 23, 1987, one month after his transfer, Jackson asked the United States District Court for the District of Massachusetts to enter a preliminary injunction requiring defendants to return him to Bridgewater.[1] The motion claimed five federal grounds for relief: 1) Jackson's transfer from Bridgewater to Norfolk violated Fourteenth Amendment procedural due process because he was denied a state-created right without a hearing; 2) Jackson was denied certain procedures available to non-prisoners in violation of the equal protection clause; 3) the transfer violated Jackson's "fundamental right to liberty";

4) the transfer resulted in cruel and unusual punishment in violation of the Eighth Amendment; and 5) the transfer was imposed in retaliation for a suit brought by Jackson against Bridgewater officials, and thus violated Jackson's right of access to the courts. Jackson also requested an evidentiary hearing.

On June 12, 1987, the district court denied the motion for a preliminary injunction, explaining that Jackson had not established a likelihood of success on the merits. It held that Jackson had no state-based rights to remain at Bridgewater, and that based on the record before it, the medical treatment available at Norfolk did not violate the constitutional minimum. The court made no express reference to Jackson's retaliation claim, and did not hold the evidentiary hearing which Jackson had requested.

On appeal, Jackson challenges the substantive findings of the district court. In addition, Jackson claims that the court below committed two procedural errors; it denied the motion for preliminary injunction without holding the requested evidentiary hearing, and it did not address several of Jackson's claimed grounds for relief.

We uphold the district court's substantive rulings, and we find that the district court did not abuse its discretion by declining to hold an evidentiary hearing. The district court erred in failing to address Jackson's claim of retaliation, but the error was harmless because of Jackson's failure to establish any likelihood of success. We therefore affirm the order of the district court denying Jackson's request for a preliminary injunction.

## II.

To be entitled to a preliminary injunction, a plaintiff must show the following four conditions:

(1) that plaintiff will suffer irreparable injury if the injunction is not granted; (2) that such injury outweighs any harm

---

1. The motion was brought as part of a 42 U.S.C. § 1983 suit that Jackson had been litigating since January 1980.

which granting injunctive relief would inflict on the defendant; (3) that plaintiff has exhibited a likelihood of success on the merits; and (4) that the public interest will not be adversely affected by the granting of the injunction.

*Planned Parenthood League of Massachusetts v. Bellotti*, 641 F.2d 1006, 1009 (1st Cir.1981) (citation omitted). The district court based its denial of the injunction on Jackson's failure to establish a likelihood of success on the merits, and we limit our consideration to this one factor. Our standard of review, generally, is whether the district court abused its discretion in denying the injunction. *Id.*

A. *Procedural Due Process*

■ Jackson claims that state officials deprived him of a liberty interest without due process of law. His claimed "liberty interest" is a state-created right to reside at Bridgewater rather than at Norfolk, and the procedure which he seeks is a pre-transfer hearing.

■ To analyze this claim, we briefly review the law as it has developed concerning Fourteenth Amendment liberty interests. Some liberty interests, such as that not to be imprisoned, are inherent in the federal constitutional law. In addition to federally defined liberty interests, certain state activities can give rise to a state-created liberty interest. An example of this type of liberty interest is a parolee's interest in not having his parole revoked. *See Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). In *Morrissey*, the Court held that once a state decides to grant parole, it has created a liberty interest in the parolee's continued freedom. Accordingly, the state may not revoke parole without appropriate procedural protections. *See also Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (holding that public education may not be deprived without due process). A third type of liberty interest is a state-provided benefit that, standing alone, does not create a liberty interest, but that in combination with certain state-provided procedural safeguards, creates an "expectancy" that is entitled to constitutional protection. An example is

the liberty interest in the granting of parole (as contrasted with the continuation of parole in *Morrissey*). *See Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). In *Greenholtz*, the Court noted that parole was not a "constitutional or inherent right," *id.* at 7, 99 S.Ct. at 2104, and that unlike the continuation of parole in *Morrissey*, a mere state-created possibility of parole is not a liberty interest. Parole, therefore, did not fit in either of the first two categories of liberty interests. However, the Court then found that the language of the Nebraska parole statute created a "protectable expectation of parole." *Id.* at 11, 99 S.Ct. at 2106. The Nebraska statute stated that officials "shall" grant parole unless one of several conditions were shown. The Court stressed that it was not deciding that all state parole laws created a protectable expectation of parole, and that each state's parole law must be examined on a "case-by-case basis." *Id.* at 12, 99 S.Ct. at 2106. Similarly, in *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), the Court held that state-created "good-time credits," combined with a provision stating that these credits could only be revoked upon proof of serious misconduct, constituted a liberty interest protected by procedural due process.

In this case, Jackson claims that his residence at Bridgewater qualifies as the third type of liberty interest. Jackson argues 1) that remaining at Bridgewater is important to him, and 2) that certain state statutory procedures give him a protected expectancy of continued confinement and treatment at Bridgewater. The district court examined the second prong of Jackson's argument, and found that the Massachusetts statute did not in fact confer any procedural rights to prisoners released from psychiatric institutions. Accordingly, the district court found that Jackson had failed to show a likelihood of success on his procedural due process claim. We fully agree with the district court's interpretation of the Massachusetts statute.

The statute at issue is Mass.Gen.Laws ch. 123 (1987), entitled "Treatment and Commitment of Mentally Ill and Mentally Retarded Persons." It contains elaborate procedures, including pre-commitment hearings, designed to ensure that no person is unnecessarily committed to a psychiatric institution.[2] Jackson argues that as well as requiring hearings before commitment, Mass.Gen.Laws ch. 123 also requires hearings before patients are discharged. His argument is based on section 9(b) of Mass.Gen.Laws ch. 123, which provides,

> Any person may make written application to a justice of superior court at any time and in any county, stating that he believes or has reason to believe that a person named in such application is retained in a facility or the Bridgewater state hospital, who should no longer be so retained, ... giving the names of all persons interested in his confinement ... and requesting his discharge or other relief.

Mass.Gen.Laws ch. 123, § 9(b). Jackson advances the theory that *all* discharges from mental institutions must follow the procedure outlined in this section. Defendants counter that section 9(b) is addressed to situations where the committed person or someone acting in his interest believes that the patient has been wrongly committed, and should be released. The section says nothing about people whom state officials have, on their own, determined to

discharge. The district court held that defendants' interpretation was correct, and we agree.

First, the statutory language simply fails to support Jackson's interpretation. Section 9(b) only provides *one* procedure for releasing a patient from an institution; it does not say that it contains the *only* procedure for releasing a committed patient. Second, we would be more disposed to adopt Jackson's unlikely reading if the statute had some procedures which seemed designed to give patients a "right" to stay in psychiatric institutions. For example, if Jackson's interpretation were correct, one might expect the statute to require a hearing upon termination of a commitment order. However, as explained above, when a commitment order expires, a patient is *automatically* released unless state officials obtain a new commitment order. A hearing on recommitment is only held if a state official petitions for recommitment, and the statute describes the official's duty in discretionary terms. *See* Mass.Gen.Laws ch. 123, § 7(b) ("The medical director of the Bridgewater state hospital ... *may* petition the district court...." (emphasis added)). Finally, our inquiry is whether Jackson had a *reasonable* expectation of a hearing before he was transferred. Even if the statute could be read in Jackson's favor, we fail to see how the strained reading could give rise to a reasonable expectation

**2.** In order to commit a prisoner to a psychiatric institution, the following steps are required: 1) the person in charge of the prison must have "reason to believe" that the prisoner requires placement in a psychiatric institute; 2) the prisoner must be examined by psychiatrists or psychologists, who then make a report to a Massachusetts district court; 3) upon order of the district court, the prisoner is temporarily committed to an institution for at most 30 days of observation and evaluation; 4) professionals at the institution submit a signed, written report to the district court; 5) the district court must hold a commitment hearing, unless such hearing is waived in writing; 6) the prisoner is entitled to counsel, to an independent psychiatric examination, and to present evidence in his own behalf, and 7) if the district court finds that the person is mentally ill and that a failure to commit the prisoner would result in a "likelihood of serious harm," the district court may order commitment. Mass.Gen.Laws ch. 123, §§ 5, 8, 18(a).

Matters of law arising in commitment hearings may be reviewed by the appellate division of the district courts. *Id.* § 9(a). Orders of commitment are valid for a maximum of one year. *Id.* §§ 8, 18(a). In order to renew a commitment, a state official must petition the district court. *Id.* § 7. Once such a petition is made, the district court then follows the same procedure as for the initial commitment. *Id.* § 8.

If any person, including the patient, believes that a patient is committed to a psychiatric institution who should not be committed, that person may petition a justice of the superior court to gain the patient's release. A hearing must be held within seven days, and counsel must be appointed to represent the indigent. *Id.* § 9(b). In a section 9(b) hearing, as opposed to a commitment hearing, the patient has the burden of proving that he does not require institutionalization. *See Thompson v. Commonwealth,* 386 Mass. 811, 438 N.E.2d 33 (1982).

when Jackson cannot cite a single Massachusetts decision which involves a challenge by a psychiatric patient to his release from a psychiatric institution. In sum, we are not convinced that Massachusetts law creates an expectation that a prisoner should receive a hearing before being released from a psychiatric institution and returned to prison.[3]

### B. *Equal Protection*

■ Jackson claims that defendants' interpretation of state law governing notice prior to transfer deprives prisoners of equal protection as guaranteed by the Fourteenth Amendment. Under Mass.Gen. Laws ch. 123, § 3, all patients transferred from one psychiatric institution to another are given six days' notice. Since Jackson was transferred from Bridgewater to MCI–Norfolk without any notice, Jackson claims that he, as well as all prisoners, are denied equal treatment under the notice provision of section 3. Jackson misreads the statute. As the district court noted, section 3 only applies to transfers within the Massachusetts psychiatric care system, and not to releases from that system. In the language of the statute, Jackson was "released," not "transferred."

### C. *Right to Liberty*

Jackson claims that his transfer from Bridgewater to MCI–Norfolk violated his "fundamental right to liberty" guaranteed by the Fourteenth Amendment. As defined by Jackson, liberty entails "the right to treatment of his mental illness once it is recognized and the right to an independent review of any Corrections decision that his

mental illness no longer needs treatment." We fail to see how this argument is anything other than a restatement of Jackson's other claims. There is no recognized "right to treatment" for prisoners that differs from the Eighth Amendment right to adequate medical care, which Jackson lists as a separate ground for relief (see below). As to a claimed right to "independent review" of his release from Bridgewater, this is a restatement of the procedural due process argument considered above. In short, if Jackson's claimed "right to liberty" is a distinct claim, he has failed to define it.[4]

### D. *Right to Treatment under the Eighth Amendment*

■ Jackson claims that he must be returned to Bridgewater because his transfer from Bridgewater to MCI–Norfolk resulted in a violation of his right to treatment under the Eighth Amendment. *See Estelle v. Gamble,* 429 U.S. 97, 103, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976); *Cortes–Quinones v. Jimenez–Nettleship,* 842 F.2d 556, 558 (1st Cir.1988). Jackson's argument is something of a non sequitur. Although the Constitution does require that prisoners be provided with a certain minimum level of medical treatment, it does not guarantee to a prisoner the treatment of his choice. *Layne v. Vinzant,* 657 F.2d 468, 471 (1st Cir.1981). Thus the Eighth Amendment violation, if any, is the denial of adequate medical treatment, not the transfer from one institution to another. Even if Jackson were to prove that the treatment available at MCI–Norfolk fell below the constitutional minimum, the district

---

**3.** Jackson also alleges that his release from Bridgewater violated state law, specifically Mass.Gen.Laws ch. 123, § 14, because the proper official did not authorize the release. This argument fails on two grounds. First, as the district court noted, section 14 is concerned with transfers within the Massachusetts psychiatric care system, and not with releases from that system. Since Jackson was released from commitment, the provision does not apply. Second, Jackson's task is to show that state procedures give him a reasonable expectation of continuing residence at Bridgewater, not merely to show that the state violated certain state-mandated procedures. While a right to a hearing under section 9(b) might arguably give rise to a

protected expectation, we fail to see how a statute which divides responsibility among various state officials could support a reasonable expectation that Jackson could remain at Bridgewater.

**4.** Jackson also alleges that the district court committed a procedural error by failing to set forth "findings of fact and conclusions of law," Fed.R.Civ.P. 52(a), with regard to his "right to liberty" claim. Since we find this claim to be merely a restatement of two other claims— claims which were adequately addressed by the district court—there was no procedural error.

court would not necessarily be required to order state officials to reverse the transfer from Bridgewater to MCI–Norfolk. Jackson's return to Bridgewater would be only one of several possible remedies for the constitutional violation. (The district court might order, for example, as an alternative to returning to Bridgewater, that Jackson receive a higher level of care at MCI–Norfolk.) That said, we turn to the ruling of the district court.

The district court determined that the psychiatric care available at MCI–Norfolk "pass[ed] the Constitutional test of providing what is medically necessary," and thus that Jackson had not established a likelihood of success on his Eighth Amendment claim. This ruling was not an abuse of discretion. The court's finding of adequate medical care was based on undisputed evidence. In an affidavit, Dr. Profit testified that both he and Dr. Kobrin were "fully satisfied that Jackson's transfer to M.C.I. Norfolk was clinically appropriate." Dr. Profit also testified that he met with the staff at MCI–Norfolk, which assured him of its "readiness and ability to provide treatment to Jackson." The court was also presented with evidence showing that MCI–Norfolk had psychiatric services, including long term psychotherapy and crisis intervention services. Finally, in a supplemental affidavit, a staff member of MCI–Norfolk· testified that by June 9, 1987, Jackson had been "calm and rational" for several weeks.

■ Jackson tendered no evidence which directly contradicted defendants' statements that the psychiatric care at MCI–Norfolk was adequate to meet Jackson's needs. Instead, Jackson insists that care available at MCI–Norfolk must be inadequate because Jackson was able to injure himself immediately following his transfer. This fact may tend to show that the MCI–Norfolk staff should have observed Jackson more carefully when he first arrived. However, the question before the district court was whether the care at MCI–Norfolk was adequate at the time it decided the motion for the injunction, not in the period immediately following Jackson's transfer.

By mid-June, when the district court ruled, Jackson had ended his campaign of self-inflicted injury. Jackson's initial injuries, therefore, did not compel the conclusion that the care available at MCI–Norfolk was constitutionally inadequate.

■ Jackson also contends that, since the state had just renewed his commitment to Bridgewater four months prior to his release, the court should have inferred that the care at MCI–Norfolk was constitutionally inadequate. To commit a person to Bridgewater, state officials must convince a Massachusetts judge that 1) the patient is mentally ill, 2) that the patient is not suited for a psychiatric institution other than Bridgewater, and 3) that "the failure to retain such person in strict custody would create a likelihood of serious harm." Mass.Gen.Laws ch. 123, § 8(b). The statute defines serious harm as self-inflicted harm, harm inflicted upon the patient by other persons, and harm inflicted by the patient upon other persons. *Id.* § 1. In light of these recent state court findings, Jackson argues, Bridgewater had to be the only Department of Correction facility that could meet his medical needs.

We do not agree that Jackson's prior recommittal to Bridgewater dictated a conclusion that the care at MCI–Norfolk was constitutionally inadequate. The argument proves too much. No person can remain committed in Massachusetts without annual commitment orders, yet at some point committed prisoners, if their condition improves, must be allowed to return to the general prison population. If a commitment order proved per se that the care available in prison fell below the constitutional minimum, then no prisoner who was committed under Massachusetts law could ever be returned to prison without violating the Constitution. Jackson's argument that his condition could not have changed so drastically as to allow release could, in substance, be made as to every committed prisoner who is released. Here there was evidence that Dr. Profit had been actively considering Jackson's return to prison at least three months prior to the October commitment hearing.

In fact, a finding under Massachusetts law that a prisoner must be committed to a psychiatric institution is not necessarily equivalent to a finding that the care available in prison falls below the constitutional minimum. We are not able to address the possible difference between the state and federal standards without examining the evidence produced at the commitment hearing.[5] However, state requirements are not necessarily constitutional requirements, and it is Jackson's burden to prove their equivalence. In sum, we do not find that the district court abused its discretion in finding that Jackson could receive adequate medical care at MCI–Norfolk.

 Jackson also argues that the district court committed a procedural error by declining to hold an evidentiary hearing before ruling on Jackson's request for a preliminary injunction based on the alleged violation of his Eighth Amendment rights. Contrary to Jackson's assertions, however, Fed.R.Civ.P. 65 does not give a plaintiff an unqualified right to an evidentiary hearing. As Judge Friendly wrote,

> Decisions on the extent to which Fed.R. Civ.P. 65 requires a district court to take evidence rather than rely on affidavits before granting or refusing a temporary injunction reflect a tension between the need for speedy action and the desire for certainty and complete fairness.

*SEC v. Frank*, 388 F.2d 486, 490 (2d Cir. 1968). Although courts sometimes state categorical rules controlling when evidentiary hearings are required, *see, e.g., SEC v. G. Weeks Securities, Inc.*, 678 F.2d 649, 651 (6th Cir.1982), we think the better course is to leave the balancing between speed and practicality versus accuracy and fairness to the sound discretion of the district court. We will overturn the district court's determination in that regard only if a clear abuse of discretion is shown. *See International Molders' and Allied Workers' Local Union No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir.1986); *Syntex Opthalmics, Inc. v. Tsuetaki*, 701 F.2d 677, 682 (7th Cir.1983).

On the accuracy and fairness side of the balance, cases range from those which depend solely on legal issues—in which no evidentiary hearing is needed—to those which present sharply conflicting versions of what happened—in which an oral hearing to judge credibility may be thought the most desirable course. *SEC v. Frank*, 388 F.2d at 490–91. In the middle of the spectrum fall cases where "there is little dispute as to raw facts but much as to the inferences to be drawn from them." *Id.* at 490. This case is of the last type. The parties do not dispute the basic events, *e.g.,* that Jackson swallowed a bedspring after his transfer to MCI–Norfolk, but they characterize differently the degree of Jackson's illness and disagree whether MCI–Norfolk offered adequate care. Although these are factual questions, they can best be answered by witnesses with medical expertise. Neither in Jackson's request for an evidentiary hearing, nor in his memorandum of law in support of the motion for a preliminary injunction, did Jackson state just what evidence he planned to offer which might dispute defendants' documentary evidence. Jackson did not, for example, offer his own expert psychiatric testimony stating that he required placement at Bridgewater or equivalent care. In these circumstances, we can hardly say that the district court abused its discretion in declining to hold an evidentiary hearing. *Cf. Town of Burlington v. Department of Education*, 655 F.2d 428, 433 (1st Cir.1981) (finding no error in district court denial of preliminary injunction without evidentiary hearing; movant had submitted no affidavits or offers of proof on the disputed issue); *Williams v. Curtiss–Wright Corp.*, 681 F.2d 161, 164 (3d Cir.1982) (per curiam) (finding no error in district court grant of preliminary injunction without evidentiary hearing; plaintiff's expert testimony was not put into issue by mere assertions of defendant).

### E. *Retaliatory Transfer*

 Jackson's final claim is that defendants transferred him to MCI–Norfolk in retaliation for his preparation of a

---

**5.** No evidence from the commitment hearing is

part of the record.

lengthy state complaint alleging numerous illegalities at Bridgewater. Such an allegation does state a claim that defendants denied Jackson his "fundamental right of access to the courts." *McDonald v. Hall*, 610 F.2d 16, 18 (1st Cir.1979). Plaintiff, however, has the "substantial burden" of proving that "he would not have been transferred 'but for' the alleged reason." *Id.*

We accept Jackson's contention that the district court should have discussed his retaliation claim. *See* Fed.R.Civ.P. 52(a) ("[I]n granting or refusing interlocutory injunctions the court shall similarly set forth the findings of fact and conclusions of law which constitute the grounds of its action."). However, the error was harmless because plaintiff presented nothing to the court that would have enabled it to find that he was likely to succeed on his retaliation claim.[6] Fed.R.Civ.P. 61.

Jackson's evidence that his transfer was motivated by retaliation is as follows: 1) defendants knew of the impending state court suit; 2) his transfer was near in time to the signing of his complaint; 3) after he was transferred, the state court defendants moved to dismiss the complaint on grounds, inter alia, that the complaint was moot because Jackson was no longer at Bridgewater; 4) defendants released Jackson just four months after he was recommitted; and 5) defendants "tricked" Jackson on the day of his transfer, raising an inference that "something questionable was going on." These circumstances do not suffice to establish a likelihood of success. The timing and rationale for defendants' actions were fully explained in the documentary evidence, and the temporal relationship with Jackson's state court suit does not even raise our suspicion, no less establish a likelihood of success. For example, Jackson stresses that his state complaint was signed and notarized on February 21, 1987 —just two days before he was transferred. This coincidence, when viewed in light of the other facts—Dr. Profit's September

conversation with Jackson, the classification hearing held on February 6, etc.—does not demonstrate that Jackson's transfer was a hastily planned conspiracy designed to defeat Jackson's pending state suit. With regard to the manner in which Jackson was transferred, this is consistent with defendants' concern that Jackson would react violently when notified of his release from Bridgewater; it is insufficient by itself to raise suspicions of "questionable" motivations. Jackson fell well short of establishing that he would likely not have been transferred "but for" defendants' retaliatory motive.

Jackson also claims that the district court erred by failing to grant an evidentiary hearing on his retaliation claim. He argues that the facts are sharply disputed—defendants provided evidence that the transfer was for medical reasons, while Jackson alleges that the transfer was motivated by retaliation—and that he is entitled to cross-examine defendants in order to prove that their testimony was false. We reject this argument. The cases which state that hearings are most appropriate if events are sharply disputed involve conflicts in the written evidence, *see, e.g., SEC v. Frank*, 388 F.2d at 491, and not, as in this case, conflicts between one party's evidence and the other's unsubstantiated allegations. Jackson presents no support for the proposition that a plaintiff, without more, is entitled to cross-examine the defendant's witnesses to prove that they lied in their affidavits. A court might, in its discretion, order such a hearing, but a failure to do so does not constitute an abuse of discretion, especially where, as here, plaintiff has not presented evidence from which an inference of retaliation can reasonably be drawn.

We do not find that the district court erred in holding that Jackson failed to establish a likelihood of success on his first four grounds for relief. We have also examined the record as it concerns the retali-

**6.** After the appeal was filed, Jackson filed a motion under Fed.R.App.P. 10(e) to supplement the record. Since we are examining the record without the aid of the district court's findings, we grant the motion and have considered plaintiff's Supplemental Record Appendix as part of the record on appeal.

ation claim, and find that Jackson has failed to establish a likelihood of success on this ground.

*The order of the district court denying a preliminary injunction is affirmed.*