**CAMPBELL SOUP COMPANY,**
**Plaintiff, Appellant,**

v.

**Paul D. GILES, Defendant, Appellee.**

No. 95–1072.

United States Court of Appeals,
First Circuit.

Heard Feb. 7, 1995.
Decided Feb. 17, 1995.

Bernard J. Bonn III, with whom Kara W. Swanson, Deborah W. Kirchwey and Dechert Price & Rhoads, Boston, MA, were on brief, for appellant.

Keith C. Long, with whom Christa A. Arcos, Anne T. Zecha and Warner & Stackpole, Boston, MA, were on brief, for appellee.

Before TORRUELLA, Chief Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

TORRUELLA, Chief Judge.

After having worked for some thirteen years in a series of sales positions at plaintiff Campbell Soup Co., defendant Paul Giles resigned to undertake similar employment at one of Campbell's chief competitors. Campbell promptly filed suit, alleging that Giles would inevitably use or disclose various trade secrets in the performance of his new duties. Among the relief sought was a preliminary injunction barring Giles from assuming his new position (at least through the end of the fiscal year) or from otherwise making use of Campbell's trade secrets. The district court denied the request for preliminary injunctive relief, finding that Campbell had satisfied none of the four criteria governing the award thereof. Campbell now appeals, complaining principally that the court erred in failing to conduct an evidentiary hearing prior to so ruling. We affirm.

## I.

Giles has worked in Campbell's New England division since 1981 in a progressively more responsible series of sales posts. In 1989, he became "Director of Retail," charged with managing the regional sales force. In February 1991, he was promoted to "Category Sales Manager" for soups, in which capacity he assisted in the development and implementation of Campbell's sales and marketing plans. And in October 1993, upon being named one of three "Area Directors," he assumed a greater role in implementing such plans (for both the soup and grocery product lines) and acquired direct responsibility for several large retail accounts.[1]

On November 1, 1994, Giles left Campbell's employ to undertake analogous duties at Pet, Inc., the manufacturer of Progresso soups (among other products) and one of Campbell's chief competitors. His new position—as Sales Manager for Pet's New England Division—involves the management of several brokers selling the company's products (soup and other foods) to regional customers.

---

1. Each of the Area Directors in the New England division handle different customer accounts. These three directors, along with the two Category Sales Managers (one for soups; one for grocery products), all report to the Regional Manager, who in turn reports to Campbell's New Jersey headquarters.

tomers. Campbell filed this diversity action against Giles shortly thereafter, claiming breach of contract,[2] misappropriation of trade secrets, and unfair and deceptive trade practices. Giles responded by advancing a series of counterclaims, including one for intentional interference with contractual relations.

The trade secrets identified by Campbell as being in Giles' possession fall into two categories: (1) marketing information for the 1995 fiscal year (which runs from August 1994 through July 1995); and (2) the existence and nature of a secret project ("the project") involving a new product line scheduled to be launched in 1995. The marketing information was said to include such data as proposed sales expenditures, the timing of promotional efforts such as advertisements and coupons, pricing strategies and other efforts to compete with competitors, and projected net unit costs (including the lowest price that could be charged customers). Campbell asserted that such information was highly confidential, since its disclosure would enable a competitor to modify its marketing plans to counteract those of Campbell. It alleged that Giles was privy to all such information. And it claimed that Giles, in undertaking to market Progresso soups in direct competition with Campbell in the same region in which he used to operate, would be unable (even in good faith) to avoid using such information. In turn, Campbell stated that the project involved a new product line designed to compete directly with some of Pet's products. Only thirty to forty of its employees (out of a total work force of 40,-000) were said to even know of the project's existence; Giles was one of the few who had been informed of the details. And any premature disclosure of the project, it argued, would enable a competitor to adapt its mar-

keting plans so as to undermine the entire venture.

In response, Giles maintained that most of the marketing information was no longer confidential—having been disclosed to customers at the outset of the fiscal year and being otherwise available through published sales materials and syndicated data sources.[3] And he insisted that, even if he were in possession of confidential marketing information, he would be in no position to exploit it to Campbell's detriment. As one of fifty-nine division sales managers at Pet, his responsibility was to implement rather than concoct market strategies. Pet's annual marketing plans (like Campbell's) were by then well into effect and could not easily be altered. And since the peak of the "soup season" ended in March or April, and since most customers placed their orders up to four months in advance, there was minimal room left for competitive positioning this year. As to the project, Giles flatly denied any knowledge thereof. He also affirmed that he intended to abide fully by his confidentiality obligations to his former employer, adding that Pet had taken pains to ensure that he would do so.

The district court declined to grant a temporary restraining order and thereafter, in a detailed decision, denied Campbell's motion for a preliminary injunction. Based on its review of the documentary evidence presented, it concluded that: (1) Campbell had failed to establish a likelihood of success on the merits; (2) withholding an injunction would not irreparably harm Campbell, whereas barring Giles from assuming his new position would likely damage his career; and (3) the public interest tilted in Giles' favor, especially given the absence of a non-competition agreement. More particularly, the court

---

**2.** Upon beginning work for Campbell back in 1981, Giles had signed a "Patent–Trade Secret Agreement" obliging him not to "use, divulge, or publish" any of the company's trade secrets without consent, either during such employment or thereafter. (No non-competition agreement, however, was ever signed.) Campbell's breach-of-contract claim alleged a violation of this trade secret agreement.

**3.** The surveys of such organizations as Information Resources, Inc. and Nielsen, he argued, recorded such information as items and quantities sold, the date and price, the type of advertising employed, and the accompanying store display.

found as follows. Whereas the project likely qualified as a trade secret, most of the marketing information was no longer confidential in light of its public disclosure. Whereas Giles was privy to the marketing information, he likely lacked any knowledge of the project. Even if some of the marketing data remained secret, and even if Giles knew of the project, he was unlikely to use or disclose any such information in his new position. And even if he did, any harm to Campbell would likely be compensable through money damages.

## II.

On appeal, Campbell does not dispute that the district court properly enunciated the test governing the award of a preliminary injunction—one which requires consideration of (1) the movant's likelihood of success on the merits, (2) the potential for irreparable harm, (3) a balancing of the relevant equities, and (4) the effect on the public interest. *See, e.g., Sunshine Dev., Inc. v. FDIC*, 33 F.3d 106, 110 (1st Cir.1994); *Gately v. Commonwealth of Massachusetts*, 2 F.3d 1221, 1224–25 (1st Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994). Nor, apart from one misplaced objection, does Campbell dispute that the district court properly applied Massachusetts trade secret law.[4] Rather, Campbell challenges the court's ruling on procedural grounds—arguing that the court erred in denying the preliminary injunction without conducting an evidentiary hearing and without promulgating adequate findings of fact under Fed.R.Civ.P. 52(a). We disagree.

As this court has previously observed, "an evidentiary hearing is not an indispensable requirement when a court allows or refuses a preliminary injunction" under Fed.R.Civ.P. 65. *Aoude v. Mobil Oil Corp.*, 862 F.2d 890, 893 (1st Cir.1988). Unlike some other courts that have adopted "categorical rules" in this regard, we have indicated that "the balancing between speed and practicality versus accuracy and fairness" should be entrusted to the district court's discretion. *Jackson v. Fair*, 846 F.2d 811, 819 (1st Cir.1988). As such, the lower court's determination as to the need for an evidentiary hearing will be overturned "only if a clear abuse of discretion is shown." *Id.* To be sure, when the parties' competing versions of the pertinent factual events are in sharp dispute, such that the propriety of injunctive relief hinges on determinations of credibility, "the inappropriateness of proceeding on affidavits [alone] attains its maximum." *SEC v. Frank*, 388 F.2d 486, 491 (2d Cir.1968); *accord, e.g., Jackson*, 846 F.2d at 819. Campbell argues that such was the case here. We nonetheless find no abuse of discretion, for several reasons.

First, it is apparent that Campbell was afforded "a fair opportunity to present relevant facts and arguments to the court, and to counter the opponent's submissions." *Aoude*, 862 F.2d at 894; *accord, e.g., Schulz v. Williams*, 38 F.3d 657, 658 (2d Cir.1994) (per curiam) (where material facts are contested, the district court need not engage in "a full evidentiary hearing conducted in open court" but must offer the parties "a reasonable opportunity to put forth, and to oppose,

---

4. The parties are in agreement that the information at stake here is of the type that, at least potentially, can qualify as trade secrets. *See, e.g., Kroeger v. Stop and Shop Cos.*, 13 Mass.App.Ct. 310, 316–17, 432 N.E.2d 566 (1982) (marketing information can constitute trade secret). They likewise agree that, were it established that Giles possessed trade secrets and was likely to use or disclose them in the course of his new duties, he could properly be barred from doing so. *See, e.g., Jet Spray Cooler, Inc. v. Crampton*, 361 Mass. 835, 839, 282 N.E.2d 921 (1972) (even in absence of applicable contractual provision, departing employee may be enjoined from using or disclosing confidential information entrusted to

him during employment, based on implied contract stemming from employer/employee relationship).

Campbell's only complaint in this regard is that the district court improperly focused on Giles' potential *disclosure* of trade secrets while ignoring his potential *use* thereof. Yet, while the court did refer solely to "disclosure" on various occasions, it elsewhere referred to improper or inevitable "use." It is evident that, rather than intending any distinction between the two terms, the court was simply employing a shorthand formula. Indeed, Campbell's counsel himself referred to the "inevitable disclosure doctrine" in a letter to the court.

the disputed evidence"); *Stanley v. University of Southern California*, 13 F.3d 1313, 1326 (9th Cir.1994) (same). Over the course of eighteen days, Campbell submitted an abundance of materials: a verified complaint, three initial affidavits, a total of seven reply affidavits (on two successive occasions), a legal memorandum, four letter briefs, excerpts from a treatise, and copies of pertinent case law.[5] The court also twice entertained oral argument—first on an *ex parte* basis from Campbell, and then during a nearly hour-long session attended by both parties. Such a wealth of submissions, we think, was sufficient to provide the court with "adequate documentary evidence upon which to base an informed, albeit preliminary conclusion." *SEC v. G. Weeks Securities, Inc.*, 678 F.2d 649, 651 (6th Cir.1982) (emphasis deleted) (quoted in *Aoude*, 862 F.2d at 894).

Second, the extent to which material factual issues were genuinely in dispute here diminishes somewhat upon closer inspection. With regard to its marketing information, Campbell does not contest that most such data is disclosed to customers at the start of each fiscal year or is otherwise readily available. It focuses instead on a few discrete items—primarily the lowest net cost of its products and the timing of its promotional campaigns. Yet Campbell has not taken issue with Giles' assertions (1) that the height of the soup season ends in March or April and (2) that customers typically place their orders up to four months in advance. Together, these assertions suggest that there is minimal room left for competitive maneuvering in this fiscal year.[6] As well, its claim that Pet can easily and quickly modify its marketing tactics in response to the actions of its competitors is at odds with its repeated contention that its own marketing plans can be adjusted only with great difficulty. And Campbell has not seriously disputed that Giles' new duties are confined to implementing, rather than developing, Pet's marketing plans.[7] Given these factors, we think the district court was warranted in finding that Giles' knowledge of any confidential marketing information would not result in irreparable harm to Campbell.

With regard to Giles' knowledge of the project, it can well be argued that the nature of the parties' respective submissions provided a supportable basis for crediting Giles' averments over those proffered by Campbell.[8] The district court appeared to do so (although some ambiguity attends the matter).[9] Yet we need not dwell on this particular issue, for the court proceeded to find that

---

5. Giles, in turn, filed an answer, four initial affidavits, two reply affidavits, three letter briefs and a memorandum.

6. Campbell has no objections to Giles working at Pet in any capacity after July 1995—by which time a new annual marketing plan (which has yet to be created) will have been implemented and the project will have been announced.

7. The middle-level sales position held by Giles at Campbell (and now at Pet) is in sharp contrast to that of the senior executive in *Pepsico, Inc. v. Redmond*, No. 94C6838, 1994 WL 687544 (N.D.Ill. Dec. 15, 1994), a case on which Campbell heavily relies. Nor has there been any suggestion that Pet was attempting to "raid" Campbell personnel (senior or otherwise); it is undisputed that Giles was recruited through a "headhunter"—several months after Campbell's 1995 marketing plans had been developed (and discussed with customers).

8. For example, Campbell initially averred that Giles was the *sole* employee in the New England division who had been informed of the project. Following Giles' retort that such a scenario was implausible in light of his rank in the office hierarchy, Campbell revised its position to state that he had been the *first* (of several) in the region to be contacted. In turn, three Campbell executives based in New Jersey averred they had disclosed the details of the project to Giles in a telephone conference call. Yet they were unable to identify the date thereof, except to say it had occurred in "late September or early October, 1994." No supporting documentary evidence was provided. Giles replied that the only conference call in which he had participated occurred on May 3, 1994 (on matters unrelated to the project). And he submitted copies of his personal calendar that appeared to corroborate this assertion. Campbell offered no response.

9. The court first stated that Campbell had "failed to present sufficient proof ... that the Project was, in fact, disclosed to Giles." With regard to this same issue, however, it noted on the next page: "In light of the substantial factual dispute which is not resolved by the pleadings, the Court is compelled to rule against Campbell which bears the burden of proof on its motion...."

(1) Giles was unlikely to disclose the project to Pet even if he knew of it and (2) Campbell would not be irreparably harmed even if he did so. Campbell has not drawn these conclusions into serious question. The record contains no indication that Giles is dishonest or would be inclined to breach his confidentiality agreement with Campbell. In turn, as mentioned, Campbell's assertion that Pet could readily alter its marketing strategies, particularly at this point in the soup season, in order to undermine the project is questionable. As well, the launch of the project is supposedly imminent; Campbell argued below, in fact, that it was originally slated to be released in January 1995. Again, therefore, we think the evidence before the court was sufficient to support a conclusion that Campbell was unlikely to suffer irreparable harm in this regard.

Finally, we reiterate what was emphasized in *Aoude:* "Even where Rule 65 factfinding is desirable, it is designed to be tentative— 'preliminary'—in nature.... The web of conclusions upon which a preliminary injunction rests are 'statements as to probable outcomes,' nothing more." 862 F.2d at 894 (quoting *Goyco de Maldonado v. Rivera,* 849 F.2d 683, 686 (1st Cir.1988)); *accord, e.g., Sierra On–Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1423 (9th Cir.1984) (in preliminary injunction context, district court need not make "binding findings of fact" but instead need only "find probabilities that the necessary facts can be proved"). For the reasons discussed above, we think the documentary evidence was sufficient to permit an informed, albeit preliminary, conclusion that injunctive relief was unwarranted. While an evidentiary hearing would undoubtedly have been helpful in light of the number of disputed issues and the lack of discovery, we are

unprepared to say that the court abused its discretion in failing to conduct one.[10]

### III.

■ Also requiring resolution is Campbell's motion to impound all appellate papers, which has been allowed on a provisional basis only and which Giles opposes. Any confidential information contained in such papers is properly withheld from public disclosure. Yet the only information conceivably falling within that category are the few details provided about the project; nothing in the descriptions of Campbell's marketing information can possibly be deemed sensitive. Accordingly, the motion to impound is granted only until such time as the project is publicly announced, at which point all appellate papers will be unsealed. *See, e.g., Pepsico, Inc. v. Redmond,* 46 F.3d 29 (7th Cir.1995). Campbell is directed to notify this court when such announcement occurs.[11]

*The order of the district court dated December 23, 1994 is affirmed. The limited injunction entered by this court on January 12, 1995 is dissolved. The motion to impound all appellate papers is allowed on a temporary basis.*

10. Campbell's related claim—that the court engaged in inadequate factfinding—can be summarily rejected. The length of the court's written decision belies any general complaint in this regard. And to the extent Campbell is challenging the court's isolated reference to "the substantial factual dispute which is not resolved by the pleadings," *see* note 9 *supra,* any error in this regard (if any there be) was harmless for the reasons just discussed.

11. Given our resolution of this appeal, we have no occasion to address Giles' assertion that Campbell's complaint fails to satisfy the $50,000 threshold requirement for diversity jurisdiction. We leave that matter to the district court in the first instance.