Mary Ann **MCGUIRE**, Ruth Schiavone and Jean B. Zarella, Plaintiffs,

v.

Thomas **REILLY**, et al., Defendants.

No. Civ.A. 00–12279–EFH.

United States District Court, D. Massachusetts.

Nov. 20, 2000.

---

Thomas M. Harvey, Boston, MA, for Plaintiffs.

Elizabeth K. Frumkin, Asst. Atty. Gen., Crim. Bureau, Patricia Correa, Adam Simms, Asst. Atty. Generals, Boston, MA, for Defendants.

## MEMORANDUM AND ORDER

HARRINGTON, District Judge.

At issue in this case is the constitutionality of the recently enacted Massachusetts statute, Mass.Gen.L. ch. 266, Section 120E ½, that regulates speech-related conduct within eighteen feet of reproductive health care facilities. The specific section of the statute that is challenged imposes both criminal and civil penalties on persons who knowingly approach another person, within six feet of such person, "for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling," unless the targeted individual consents to such approach.[1] Exempted from the statute are

---

1. Mass.Gen.L. ch. 266, Section 120E½(b). The statute reads in relevant part: "No person shall knowingly approach another person or occupied motor vehicle within six feet of such person or vehicle, unless such other person or occupant of the vehicle consents, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral pro-

"persons entering or leaving such facility" and "employees or agents of such facility acting within the scope of their employment."[2] The question is whether the First Amendment rights of the speaker are abridged by the protection the statute provides for the unwilling listener.

Plaintiffs Mary Anne McGuire, Ruth Schiavone, and Jean B. Zarrella are three private citizens who regularly travel to the sidewalks and public ways in front of and near reproductive health care facilities, attempting to dissuade women from having abortions by engaging in counseling activities, including distributing leaflets and engaging in oral conversations. Plaintiffs allege that their fear of criminal prosecution caused them to be chilled in their exercise of fundamental constitutional rights.

Plaintiffs filed a Complaint praying for a declaration that the Massachusetts statute is facially invalid and seeking an injunction against its enforcement. They allege that Mass.Gen.L. ch. 266, Section 120E½ is facially unconstitutional because it violates their right to freedom of speech under the First and Fourteenth Amendments to the United States Constitution. Specifically, plaintiffs claim three causes of action: (1) a violation of the First Amendment's Freedom of Speech Clause; (2) a violation of the Equal Protection Clause of the Fourteenth Amendment; and (3) a violation of the Due Process Clause of the Fourteenth Amendment. The several named defendants are those state officers empowered to prosecute violators of the laws of the Commonwealth, and are represented by the Attorney General of the Commonwealth of Massachusetts.

The issue pending before this Court is whether, on its face, the statute is unconstitutional in any of the following four respects, First, whether the Act's explicit singling out of reproductive health care facilities indicates that is a content-based regulation of speech. Second, whether the exemption for certain people, particularly employees and agents of the facilities, represents impermissible governmental protection for one side of the abortion debate, while abridging fundamental free speech rights of the other. Third, whether the process for physically marking the buffer zones amounts to a discriminatory activation provision. Fourth, whether the language of the statute, aimed primarily at oral communications, reveals that its true intent is the suppression of speech rather than any of the four stated purposes.[3]

██ In order to obtain a preliminary injunction, plaintiffs must show that: (1) they will suffer irreparable harm if the injunction is not granted; (2) such injury outweighs any harm which granting injunctive relief would inflict on the defendants; (3) they have a reasonable likeli-

---

test, education or counseling with such other person in the public way or sidewalk area within a radius of 18 feet from any entrance door or driveway to a reproductive health care facility or within the area within a rectangle not greater than six feet in width created by extending the outside boundaries of any entrance door or driveway to a reproductive health care facility at a right angle and in straight lines to the point where such lines intersect the sideline of the street in front of such entrance door or driveway." *Id.*

2. *See* Section 120E½(b)(1–2). Also exempted are various law enforcement and emergency personnel, and persons using the public sidewalk or street right-of-way adjacent to such facility solely for the purpose of reaching a destination other than such facility. Section 120E½(b)(3–4).

3. Section 1 of S.B. No. 148 reads: "The purpose of this act is to:—(a) Increase the public safety in and around reproductive health care facilities; (b) maintain the flow of traffic and prevent congestion around reproductive health care facilities; (c) enact reasonable time, place and manner restrictions to reconcile and protect both the first amendment rights of persons to express their views, assemble and pray near reproductive health care facilities and the rights of persons seeking access to such facilities to be free from hindrance, harassment, intimidation and harm; and (d) create an environment in and around reproductive health care facilities which is conducive to safe and effective medical services, including surgical procedures, for patients."

hood of success on the merits; and (4) the public interest will not be adversely affected by the granting of this injunction. *See Foxboro Co. v. Arabian Am. Oil Co.,* 805 F.2d 34, 36 (1st Cir.1986); *see also Campbell Soup v. Giles,* 47 F.3d 467, 470 (1st Cir.1995). Here, in dealing with the First Amendment rights of free speech, it is virtually undisputed that plaintiffs have reached at least two of those factors. The impermissible chilling of First Amendment rights is, perhaps, one of the more compelling examples of irreparable harm. Further, the right of free speech is so precious in our constitutional scheme that such injury outweighs whatever harm is inflicted on defendants. To be sure, the public interest is affected by either the implementation of the statute or an injunction against it. Whether the public interest is more adversely affected by the statute or by an injunction against it is ultimately dependent on the reasonable likelihood of plaintiffs' success on the merits in challenging the statute's constitutionality.

Defendants contend that this matter is covered and is controlled by the United States Supreme Court's recent decision in *Hill v. Colorado,* 530 U.S. 703, 120 S.Ct. 2480, 147 L.Ed.2d 597 (2000). In *Hill,* the Court found constitutional a Colorado statute nearly identical to the Massachusetts statute at issue in this case. The Colorado statute creates a 100–foot buffer zone around all medical facilities in that state, and prohibits all unwanted approaches within eight feet of anyone inside of the buffer zone. In a 6–3 decision, the Supreme Court upheld four state court opinions determining that the Colorado statute was content-neutral. As a result, the Court applied the test it articulated in

*Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), finding that the statute imposed "content-neutral time, place and manner restrictions narrowly tailored to serve a significant government interest" and "left open ample alternative channels of communication." *Hill,* 530 U.S. at ——, 120 S.Ct. at 2486 (quoting *Ward,* 491 U.S. at 785, 109 S.Ct. 2746). In doing so, the Court said that "the principal inquiry in determining content-neutrality, in speech cases generally and in time, place or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Hill,* 530 U.S. at ——, 120 S.Ct. at 2491 (quoting *Ward,* 491 U.S. at 791, 109 S.Ct. 2746). The Court found that "the Colorado statute pass[ed] that test for three independent reasons." *Hill,* 530 U.S. at ——, 120 S.Ct. at 2491.

> First, the statute was not a regulation of speech. Rather, the Colorado statute was "a regulation of the places where some speech may occur." Second, it was not adopted "because of disagreement with the message it conveys...." Third, the State's interests in protecting access and privacy, and providing the police with clear guidelines, are unrelated to the content of the demonstrators' speech.... [G]overnment regulation of expressive activity is "content neutral" if it is justified without reference to the content of the regulated speech. *Id.*

Defendants urge that the Massachusetts statute is so similar to the Colorado statute that this Court is bound to reach the same result as the United States Supreme Court did in *Hill.*[4] If anything, they claim,

4. Defendants also point to an advisory opinion from the Justices of the Massachusetts. Supreme Judicial Court which opined that Senate 148, as then written, did not violate the First Amendment to the United States Constitution and/or Article 12 of the Massachusetts Declaration of Rights. While the Supreme Judicial Court found that the explicit reference to reproductive health care facilities did not render the statute a content-based

regulation, the Massachusetts statute in this case is different from the one reviewed by the Supreme Judicial Court. Months after the Supreme Judicial Court opinion, the United States Supreme Court decided *Hill v. Colorado, supra,* prompting the Massachusetts Legislature to redraft Senate 148, borrowing language from the Colorado statute. Further, the Supreme Judicial Court did not address the relevance of exemptions for certain

the Massachusetts' statute is less burdensome to free speech. The Massachusetts buffer zone is considerably smaller than Colorado's (eighteen feet as opposed to 100 feet) and offers less protection from unwanted approaches (six feet as opposed to eight feet). Further, defendants argue, the Massachusetts legislature crafted the statute to be only as restrictive as necessary to serve its purposes. Whereas the Colorado statute applies to all medical facilities, the Massachusetts statute is more narrowly-tailored and applies only to reproductive health care facilities. In that way, speech is regulated only where its exercise has given rise to a competing government interest.

Conversely, plaintiffs urge that *Hill* does not apply because the Massachusetts statute is distinguishable from the Colorado statute in several fatal respects. First, because the Massachusetts statute applies only to reproductive health care facilities and not to all medical facilities, the statute is not content neutral. Both the explicit language of the statute and the legislative history make clear that only reproductive health care facilities, *in fact only those where abortions are offered or performed*, fall within the purview of the Act.[5] Unlike in Colorado, where the legislature heard testimony regarding animal rights demonstrations, the Massachusetts legislature heard only testimony about the climate around abortion clinics.[6] Plaintiffs argue, then, that the Massachusetts statute is a content-based regulation of speech and thus, should be subjected to strict scrutiny by this Court.

Plaintiffs also contend that the statutory exemption for several groups of people, particularly employees or agents of the abortion clinics, is a violation under the Equal Protection Clause of the Fourteenth Amendment. Employees and agents of the clinics are not required to gain consent before approaching anyone in the buffer zone, and may do so for any reason within the scope of their employment. Plaintiffs claim that the exemption reflects impermissible governmental preference and support for one side of the debate. Indeed, the legislative history submitted by defendants records testimony from an agent of one clinic who participates in an organized group of "pro-choice women and men" who voluntarily escort women as they enter and exit the facility. *Exhibit I.*[7]

Ultimately, then, the Massachusetts statute differs from its Colorado counterpart in two critical ways. One, the Massachusetts statute applies only to abortion clinics, and not to all medical facilities and, two, the regulation of speech does not apply equally to everyone involved in the abortion debate.

 The initial issue before this Court is to determine whether Mass.

---

groups of people. As a result, while the Supreme Judicial Court decision informs this Court, it would not be fair to presume that the Supreme Judicial Court has announced its interpretation of this statute in its current form.

5. *See* Mass.Gen.L. ch. 266, Section 120E½(a).

6. *See* Defendants' Brief, Kealy Aff., *Exhibits A–I*.

7. Plaintiffs make two additional arguments. Plaintiffs claim that the operators of the facilities are vested with speech-regulating powers reserved for the government because of the provision that requires facilities wishing to avail themselves of the statute's protections to mark the regulated zones. That provision is more logically viewed as a notice requirement serving to protect the interests of speakers such as plaintiffs. Further, the Boston Police actually executed the posting and marking, according to the specifications outlined in the statute. Plaintiffs also urge that an examination of the statutory language reveals that the government's true intent is the suppression of speech rather than the ostensible public policy and safety concerns articulated in the legislative history because the statute fails to cover acts of physical violence. This argument, that the statute's focus on oral communications reveals that its intent is the suppression of speech rather than the promotion of public safety, is considered by this Court under the issue as to whether the speech regulated is content-based speech.

Gen.L. ch. 266, Section 120E½ restricts content-based speech or is a content-neutral regulation. Content-based restrictions are subject to strict scrutiny by the courts because they place the weight of government behind the disparagement or suppression of some messages. *Hill,* 530 U.S. at ——, 120 S.Ct. at 2499. The government is held to a very exacting and rarely satisfied standard when the statute disfavors the discussion of particular subjects, such as abortion, or particular viewpoints within a given subject matter, either the pro-life or pro-choice position. *Hill,* 530 U.S. at ——, 120 S.Ct. at 2500. A statutory restriction of speech is content-based requiring strict scrutiny if the restriction is imposed because of the content of the speech. *Hill,* 530 U.S. at ——, 120 S.Ct. at 2500.

■ A statute restricts viewpoint based speech if it "makes it likely that prosecution will occur based on displeasure with the position taken by the speaker." *Hill,* 530 U.S. at ——, ——, 120 S.Ct. at 2485, 2486. The principal inquiry in determining whether a statute's restrictions are content-based is whether the government has adopted a regulation of speech because of disagreement with the message the speech conveys. *Hill,* 530 U.S. at ——, 120 S.Ct. at 2491.

The Massachusetts statute applies exclusively to speech communicated at abortion clinics and not, as did the Colorado statute, to *all health care facilities.* The Supreme Court held the speech restricted in *Hill* to be content-neutral because of the comprehensive coverage of the Colorado statute. The Colorado General Assembly "was concerned with the safety of individuals seeking *wide-ranging health care services,* not merely abortion counseling and procedures." [emphasis supplied.] *Hill,* 530 U.S. at ——, 120 S.Ct. at 2488. The *Hill* case that the comprehensiveness of the

statute was a virtue, not a vice, because it was evidence against there being a discriminatory governmental motive. The *Hill* case stressed that the Colorado statute applied as equally to used car salesmen, animal rights activists, fundraisers, environmentalists, and missionaries, as it did to abortion protestors. It is clear that the Colorado statute regulates a broad category of communications, and is not limited merely to speeches relating to abortion.

However, the restrictions set forth in the Massachusetts statute pertain exclusively to speech that communicates a message of protest, education or counseling spoken at the entrances of abortion clinics and are directed only at the subject of abortion.[8] It is also only speech, and not acts of physical violence, that is regulated by a statute whose purpose is ostensibly public safety. In brief, the restrictions contained in the Massachusetts statute apply only to speakers involved in the abortion debate. The legislative history also makes this exceeding clear. The Court rules that the statute is a regulation of speech and the content of the only speech regulated is the subject of abortion.

■ However, even if the regulation were held not to be one of content-based speech because the statute is "justified without reference to the content of the regulated speech" because of the competing government interest of safety and order, *Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), restrictions on speech must be absolutely neutral regardless of the viewpoint being expressed. *Hill* emphasized that the Colorado statute's restrictions did not favor nor discriminate against either abortion viewpoint, as the restrictions applied regardless of the viewpoint being advocated.

---

**8.** Logic and experience dictate that in order to determine whether a particular speech constitutes oral protest, education or counseling, rather than social or random conversa-

tion, it is necessary to examine the content of the exact words which were actually spoken in the conversation between the speaker and the listener.

■ Thus, the ultimate issue for determination by this Court is whether the restrictions contained in the Massachusetts statute apply equally to all speakers at the entrances of abortion clinics, regardless of their viewpoints on abortion, and do not favor one viewpoint over another. *Hill,* 503 U.S. at ——, ——, 120 S.Ct. at 2486, 2491. There can be no discrimination between the viewpoints advocated, between those who advocate that the life of the unborn child should be preserved and those who advocate that the viability of the unborn child can by legal right be terminated.

The Massachusetts statute, by its very terms, exempts from its restrictions the employees and agents of the abortion clinics within the restricted public areas.[9] These individuals, because of their personal relationship with the abortion clinic, have a strong financial interest or philosophic incentive to counsel the listener to undergo an abortion and they constitute very zealous advocates for this controversial procedure. *In contrast, the Colorado statute in Hill allowed no exemptions from its restrictions on speech.*

For the Massachusetts statute to pass constitutional muster, this exemption, at the very least, must be stricken from the statute's provisions. With this exemption as a constituent provision of the statute, the statute's restrictions are directed against speakers who advocate the pro-life position and exempt from its restrictions employees and agents of the abortion clinics who retain the unfettered right to educate and counsel potential abortion clients within the restricted public areas. The restricted areas are where the contending advocates have the most immediate and forceful persuasive impact on the listener; where the opposing viewpoints are most vigorously contested. This constitutes patent discrimination, and this statute, therefore, cannot be considered a content-neutral regulation of speech. The Massachusetts statute clearly accords preferen-

tial treatment to expression concerning one particular viewpoint on the abortion issue, that of pro-choice.

This preference constitutes unequal protection of the law in the precious area of free expression in a matter of serious public debate where the government must be absolutely neutral. "[U]nder the Equal Protection Clause, not to mention the First Amendment itself, government may not grant the use of a forum to people whose views it finds acceptable, but deny use to those wishing to express less favored or more controversial views." *Police Department of the City of Chicago, et al. v. Mosley,* 408 U.S. 92, 96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972). By the discriminatory terms of the statute, it is clearly manifest that the government disfavors the discussion of a particular viewpoint, the viewpoint that counsels a respect for the life of the unborn child in the robust abortion debate. The government must never take sides in the battle of ideas and ideals in the traditional public forum.

Because of the exemption of the abortion clinics' employees and agents from the statute's restriction of speech on the subject of abortion within the restricted public areas, this Court holds that it is obvious that, in discriminating against the viewpoint of the pro-life advocates, the government has adopted a regulation of speech because of disagreement with the message that speech conveys, while at the very same public forum permitting interested abortion advocates to be absolutely free to counsel their listeners to have an abortion. For a statute to permit one viewpoint in a serious debate over public policy to speak freely in the public square, while the other side is statutorily required to remain silent strikes at the core of the First Amendment. The government must remain scrupulously neutral in the area of free speech or that great bulwark of human freedom is eroded.

The issue of abortion is one of the most profound moral, religious and legal issues

9. Employees and agents of abortion clinics escort potential abortion clinic clients and counsel and exhort them to undergo an abortion within the restricted areas.

of our time. Not since the issue of slavery tore asunder the social fabric of the Union and led to the tragedy of the Civil War, in which the blood of brothers drenched the soil of this nation in expiration of slavery's grievous crime against nature, has an issue so galvanized the intellectual and spiritual conscience of the nation.

The intense national debate on abortion is based on a profound and serious philosophical and biological dispute between so-called pro-life advocates who are morally convinced that an unborn child is a living human person whose right to life should be secured by the protections of the United States Constitution and so-called pro-choice advocates who are as convinced that the unborn child is not such a living human person and that the unborn child's mother has the choice to terminate the life of her unborn child, even, in some instances, of a child partially born.[10]

It was less than thirty years ago that abortion was branded an abominable crime by most states, and considered a moral evil by most people.[11] Pro-life advocates who firmly believe that abortion remains a grave moral evil must be given as equal an opportunity as their opponents to express to those seeking an abortion their sincere message of respect for the sanctity of innocent human life.[12] The First Amendment requires no less. *Police Department of the City of Chicago, et al.*, 408 U.S. at 96, 92 S.Ct. 2286. The right to speak as freely as one's opponents in the traditional public forum is the most valuable of our rights in a constitutional democracy, for otherwise public policy would not be shaped by a fully informed and fair citizenry.

This Court declares Mass.Gen.L. ch. 266, Section 120E½(b) to be unconstitutional as violative of the First Amendment to the United States Constitution and issues a preliminary injunction enjoining its enforcement pending a hearing on the merits of the case.[13] This section disfavors the discussion of the subject of abortion and the pro-life viewpoint within that subject matter.

SO ORDERED.

---

**10.** In addition to the unborn child, others who have been accorded non-person status under the law were Blacks in the ante-bellum south suffering under the inhuman, but constitutional yoke of slavery and Jews in Hitler's Nazi Germany who were herded under deportation orders to the gassy fumes of the death camps. It is one of the glories of our nation's history that William Lloyd Garrison and the other Abolitionists were free to vigorously express their conviction that slavery was a grave moral wrong.

**11.** *See* Ernest Hemingway's short story, "Hills Like White Elephants," in which the couple only hint at a contemplated abortion in hushed tones because of deep and bitter shame.

**12.** Before one is quick to criticize the zeal of the pro-life advocates, he should recall Henry David Thoreau's "Civil Disobedience," one of the most influential political documents in the world and the manual for groups who, believing their government to be acting immorally, wish to awaken the conscience of its people. Thoreau believed that it was the essence of heroism to be willing to suffer the indignity of imprisonment for the higher principle of confronting what is believed to be a moral evil.

**13.** This specific section of the statute is ruled severable from the complete statute itself.